UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

John Sells,                                                Civil No. 14-4754 (DWF/JSM)

          Plaintiff,

v.                                                      **MEMORANDUM**
                                                            **OPINION AND ORDER**

City of White Bear Lake,

          Defendant.

---

Alf E. Sivertson, Esq., and Marit M. Sivertson, Esq., Law Offices of Sivertson & Barrette, PA, counsel for Plaintiff.

Julie A Fleming-Wolfe, Esq., counsel for Defendant.

---

**INTRODUCTION**

This matter is before the Court on Defendant City of White Bear Lake's (the "City") Motion for Summary Judgment. (Doc. No. 24.) For the reasons set forth below, the Court grants the motion.

**BACKGROUND**

**I.**     **Factual Background**

In the spring of 2000, Plaintiff John Sells ("Sells") was hired by the City as a Support Services Supervisor in the City's Police Department. (Doc. No. 33 ("Sivertson Aff.") ¶ 2, Ex. 1 ("Sather Dep.") at 8; *id.* ¶ 3, Ex. 2 ("Sells Dep.") at 10.) In this position, Sells was part of the Police Department's "administrative team" and remains in that

position currently.  (Doc. No. 10, Am. Compl. ¶ 11.)  Mark Sather ("Sather") has been the City Manager throughout Sells' employment.  (*Id.*)

As a Support Services Supervisor, Sells' primary duties include managing the Police Department's 911 Communications Center, supervising communications personnel (including non-union records technicians, union 911 dispatchers, room technicians, and community service officers),[1] administering the Computer Aided Dispatch ("CAD") system, and providing IT support for the Police Department.  (Sells Dep. at 13, 24-25; Am. Compl. ¶ 12.)

Sells is not a union employee.  (Sells Dep. at 145-146.)  As a non-union employee, Sells is paid according to the City's Position Classification and Compensation Plan ("Compensation Plan"); his salary is dependent in part on both the City Council's approval and Sather's recommendations for annual increases in compensation.[2]  (Sells Dep. at 147-49, 152-53.)

When Sells accepted the position with the City, he was aware that he would earn less money than at his previous job, but he claims that Chief Todd Miller ("Miller") told him that he could anticipate yearly increases in pay.  (Sells Dep. 14, 17-18, 23.)  In particular, Sells claims that Miller told him that he would request a pay increase for the

---

[1]   Records technicians were union employees in May 2000, but became non-union employees in 2007.  (Sather Dep. at 75-77.)

[2]   Sells argues both that he was not paid according to the City's Compensation Plan and that the City failed to follow the Compensation Plan in determining his compensation.  Sells, however, does not submit evidence that could lead a reasonable juror to conclude that the City did not apply the City's Compensation Plan with respect to Sells' compensation, even if Sells was unaware of, or disagrees with, the City's application of the Plan.  (Sells Dep. at 147.)

2

position during upcoming budget hearings, and that all employees received annual cost-of-living ("COLA") increases and step-raises. (*Id.* at 15.)[3] Sells acknowledges that Miller also explained that "different employees in different classifications receive different step raises." (*Id.* at 15-16.) In fact, the City does not give COLA increases or step-raises to non-union employees. (Sather Dep. at 21-25.) Instead, any annual pay increase for a non-union position is based on market analysis, duties and responsibilities of the position, and performance. (Sather Dep. at 27-29, 37-38, 42-46.)

In December 2000, Sells received a salary increase of approximately $10,000 based on the "temporary adjustment of [the] position to include additional duties, pending formal reevaluation." (Doc. No. 28 ("Fleming-Wolfe Aff.") ¶ 4, Ex. 3.) Both parties go into great detail about the amounts and circumstances surrounding each of Sells' wage increases over the years. Because not all of the details are material, they are summarized briefly below.

In May 2002, Sells received a 3.75% wage increase retroactive to January 1, 2002, and a 2% prospective increase. (Fleming-Wolfe Aff. ¶ 5 Ex. 4 at D0591.) In December 2002, Sather authorized a 2003 salary adjustment for Sells, increasing his salary to $4,310.42 per month. (*Id.* at D0592.) In June 2004, Sells' job evaluation was completed and Sather authorized another pay increase retroactive to January 2004. (*Id.* at D0293.) In 2005 and 2006, Sells received additional increases. (Fleming-Wolfe Aff. ¶ 5, Ex. 4 at

---

[3] Sells claims, for example, that he was told that he would receive the same increases in compensation as union dispatchers, and that in years that he did not receive a step increase, he would be eligible for a merit increase. (Sells Dep. at 16-17, 21; Am. Compl. ¶ 13.)

3

D0594-95.) In 2007, Lynne Bankes ("Bankes"), who had replaced Miller as Chief of Police, authorized a 3.15% increase for Sells. (*Id.* at D0596.) In 2008, Sells received a 3% performance increase. (*Id.* at D0597.) In 2009, Sells received a 3.25% increase and a .25% merit raise, and this was later adjusted upward for a 4% overall pay increase. (*Id.* at D0598-600.)

From 2003 through 2011, Sells received positive performance evaluations, either meeting or exceeding expectations. However, Sells did not receive a pay raise for two years, which he asserts was "ostensibly because of the financial collapse." (Doc. No. 31 at 8.) On January 13, 2012, Sells met with Bankes and explained that he should receive a merit pay increase for 2011. Sells testified that during this meeting Bankes indicated that Sells would be demoted from his position to a lower pay grade, and expressed her belief that Sells was overpaid in his position. (Sells Dep. at 65-66.) There is no evidence in the record that Sells was actually demoted.

On January 17, 2012, Sather convened a meeting with non-union employees, including Sells. Sells asserts that at this meeting Sather stated that non-union employees receive equitable compensation in comparison to union employees, receiving increases that are based on the outcome of bargaining units and similar step raises, along with merit pay when reviews exceed expectations. (Sells Dep. at 63-65.)

On April 3, 2012, Sather approved a 2% raise for Sells. (Fleming-Wolfe Aff. ¶10, Ex. 9.) On May 30, 2012, Sells prepared a detailed e-mail to Sather outlining problems within the department, including his salary history, which he claimed showed missed raises, as well as extra duties and hours imposed on him. (Sells Dep. at 70-85; Ex. 10 at

4

D0443-81.) Sells provided comparison charts that he created to demonstrate the differences between his raises and those given female employees he supervised. (Fleming-Wolfe Aff. ¶ 11, Ex. 10 at D0449-64.) In November 2012, Sells provided more information about added duties, responsibilities, and hours, as well as his compensation history. (*Id.* ¶ 12, Ex. 11; Sells Dep. at 86-94.)

Bankes retired in 2013 and was replaced by Julie Swanson ("Swanson"). (Sells Dep. at 98.) In July 2013, Swanson and Captain Randy Johnson recommended salary increases for Sells on January 1, 2013, and again on July 1, 2013, bringing his annual salary to $67,291.21. (Fleming-Wolfe Aff. ¶ 13, Ex. 12 at D0565-575.)

On July 18, 2014, Sells received his performance evaluation covering the period from June 2013 to June 2014. (*Id.* ¶ 14, Ex. 13.) Sells did not receive any "exceeds expectations" ratings, and he noted his concern about this. (*Id.*) Sells testified that Swanson informed Sells that he would no longer be eligible for an "exceeds expectations" rating. (Sells Dep. at 102-107.) Swanson later confirmed that she did not pursue merit pay for Sells and recommended a 2% salary increase. (Sivertson Aff. ¶ 10, Ex. 9.)

Sells asserts that, excluding merit pay increases, he received fourteen raises during the relevant time period. (Fleming-Wolfe Aff. ¶ 15, Ex. 14.) Sells began at the hourly rate of $18.51/hour and ended at $32.67/hour. (*Id.*) Sells also submits evidence of female employees' pay history, for example: Angie Stewart (union dispatcher) received twenty-four raises from 2000 through 2015, starting at $13.94/hour and ending at $28.10/hour; Cindy Ristow (community services officer) received twenty-one raises from

2000 through 2015, starting at $8.50/hour and ending at $22.35/hour; Naomi Clark (union dispatcher) received twenty raises from 2005 through 2015, starting at $15.80/hour and ending at $28.10/hour; Megan Christensen (non-union records technician) received eight raises from 2008 through 2015, starting at $16.60/hour and ending at $22.35/hour; Kyle Dreher (non-union records technician) received two raises from 2008 through 2009, starting at $16.44/hour and ending at $17.27/hour; and Denise Shaughnessy (room technician) received four raises from 2012 through 2014, starting at $16.210/hour and ending at $17.59/hour. (*Id.*)

In this case, Sells asserts a single claim for Title VII Pay Discrimination under 42 U.S.C. § 2000e-2(a)(1). Sells alleges that the female employees he supervised received more and larger raises than Sells, and that the differences constitute sex-based pay discrimination. (Am. Compl. ¶ 23.) Sells seeks past wage losses exceeding $212,000, as well as an adjustment of salary and benefits going forward. (*Id.* ¶ 24.)

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive

6

determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.   Gender Wage Discrimination

Sells claims that he was discriminated against on the basis of his gender because the City paid him wages "at a rate less than the rate at which it paid wages to the female employees within the department who were supervised by Sells." (Am. Compl. ¶ 23.) The City argues that Sells' claim fails as a matter of law because he cannot establish a prima facie case of gender discrimination and, even if he could, Sells has not pointed to any evidence that any actions or decisions regarding his compensation were based on his gender. The Court agrees with the City.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The parties agree that the burden-shifting framework promulgated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973), applies here. *Wells v. SCI Mgmt., L.P.*, 469 F.3d

697, 700 (8th Cir. 2006).  Under the *McDonnell Douglas* framework, if Sells establishes a prima facie case of gender discrimination, the burden shifts to the City to produce a legitimate, non-discriminatory reason for the adverse employment action.  *Id*. at 701.  If the City is able to articulate such a reason, the burden then shifts back to Sells to show that the proffered reason is merely a pretext for discrimination.  *Id*.

In order to establish a prima facie case of gender discrimination, Sells must demonstrate that he:  (1) is a member of a protected group; (2) was qualified for his job; (3) suffered an adverse employment action; and (4) circumstances exist which create an inference of discrimination.  *Wells*, 469 F.3d at 701. The fourth element can be met by demonstrating that similarly-situated employees of the opposite sex were treated differently.  *Id*.[4]

The parties dispute whether Sells can demonstrate that circumstances exist which create an inference of discrimination.  Sells bases his claim of discrimination on the allegation that he received fewer and lower percentage pay increases than certain female employees that he supervised.  Sells argues that the issue of whether he was similarly situated to the women he supervised was "unequivocally decided by Sather."  (Doc. No.

---

[4]     The City asserts that because Sells is a male, his prima facie case involves the additional step of showing that background circumstances support the suspicion that the City is "that unusual employer who discriminates against the majority."  *See Nava v. Titan Wheel Corp. of Wisc.*, 216 F. Supp. 2d 882, 898 (N.D. Iowa 2002), *citing Duffy v. Wolle*, 123 F.3d 1026, 1028 (8th Cir. 1997), *cert. denied*, 523 U.S. 1137 (1998).  Plaintiff disputes that he must make this showing.  However, the Eighth Circuit Court of Appeals affirmed a decision that required the additional "background circumstance" showing in a reverse discrimination case.  *See Michaelson v. Waitt Broad., Inc.*, 187 F. Supp. 2d 1058 (2002) (citing *Duffy*), *aff'd* 55 Fed. App'x. 401 (8th Cir. 2003).  Sells has not even attempted to make such a showing.  Even so, Sells' prima facie case fails for the additional reasons stated herein.

31 at 19.) In particular, Sells points to Sather's deposition testimony wherein Sather stated the following about Sells' position:

> [It] was essentially a dispatcher's position. It evolved from a lead dispatch. It was called communications coordinator. . . . [And the position was] primarily to do the scheduling and coordination of the dispatch function in our PSAP . . . public safety answering point, and it was intended to essentially provide about half of its time as a dispatcher behind the console and the remainder coordinating the dispatch functions and providing reporting to different agencies regarding the dispatch function.

(Sather Dep. at 11-12.) Sells argues that Miller underscored the similarity between Sells and the women he supervised by indicating that Sells would be given the same raises over the same period of time as the female dispatchers.

The City argues that Sells has not established the fourth prong of his prima facie case because he lacks evidence to show that background circumstances support the suspicion that the City discriminates. In particular, the City submits that none of the female employees Sells identified are similarly situated to Sells in any relevant respect. The City points out that the women to whom Sells compares himself held different positions, and that Sells' background, title, duties, and responsibilities were distinct and led to different pay increases. In addition, the City points out that the dispatch employees to whom he compares himself were union employees. Thus, their compensation was determined by a union contract that does not apply to Sells' employment.

"The test for whether employees are 'similarly situated' to warrant a comparison to a plaintiff is a 'rigorous' one." *Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 568 (8th Cir. 2000) (citation omitted). Employees identified for comparison must be "similarly situated in all relevant respects." *Williams v. Ford Motor Co.*, 14 F.3d

9

1305, 1309 (8th Cir. 1994) (citation omitted).  Here, the Court concludes as a matter of law that Sells has not submitted evidence that he is similarly situated to the female employees to whom he compares himself.

First, a complete reading of Sather's deposition testimony, and the record as a whole, reveals that Sells' duties and position differ significantly from those of the female employees he has supervised.  While Sather initially described Sells' position as "essentially a dispatcher's position," that description applied to the position before Sells was hired. (Sells Dep. at 11-12.)  Shortly after Sells was hired, the title of the position changed to "Support Services Coordinator," and Sells was given a 23% increase in pay to reflect the change in duties: "[T]here was an argument, or a case presented, that they were revising his duties and there was [sic] adding more technology to the assigned duties and as a result of that it resulted in—it included an upgrade under the city's position Classification and Compensation Plan."  (Sather Dep. at 19-20.)  Sells has performed many duties beyond that of dispatch, including supervisory and management functions, as well as technology assistance (Sells Dep. at 13), and there is no evidence that any of the female employees he supervised performed these additional duties.

Second, the record reveals that Sells' specific duties and job classification, along with his performance, all affected his level of compensation, and his performance evaluations and compensation levels were based on different metrics than those used for the female employees.  (Sells Dep. at 144-45, 166-67, 170-73, 176-77, 179-80.)  Therefore, the female employees' compensation histories are not useful comparators.  Further, several of the dispatch employees that Sells supervised were union employees.

Thus, their compensation was determined by a union contract. Sells is not a union employee and, therefore, would not be compensated under that contract, and he would not be entitled to the same number or percentage of step or COLA increases under the contract. (*See* Sells Dep. at 144-146.)

Based on the above, the record demonstrates that the female employees to whom Sells compares himself occupied different positions, performed different duties, and were compensated under different terms. These differences preclude a finding that he was similarly situated with the female employees he supervised. *See, e.g.*, *Michaelson v. Waitt Broad., Inc.*, 187 F. Supp. 2d 1059, 1071 (N.D. Iowa 2002) (holding as a matter of law that a male sales manager was not similarly situated "in all relevant respects" to a female salesperson who reported to him); *Riser v. Target Corp.*, 458 F.3d 817, 822 (8th Cir. 2006) (holding that plaintiff failed to demonstrate that comparators were similarly situated where the comparators worked at separate locations, worked different shifts, and performed different duties than the plaintiff). In fact, the female employees to whom he points were paid *less* than Sells, despite the fact that they may have received more frequent and larger increases (based on percentage) in their salaries. Because the female employees are not similarly situated to Sells, any evidence regarding disparate compensation histories does not give rise to an inference of discriminatory animus toward Sells. Moreover, nothing else in the record points to gender discrimination in any manner.

Even if Sells was able to establish a prima facie case of discrimination, his showing of pretext would fail. Here, the City has proffered evidence that it paid Sells

according to the City's Compensation Plan.  Sells believes that he was entitled to an additional and larger pay increase, but Sells has not offered any evidence that the reason his raises were not larger or more frequent is because he is a man.  Indeed, when asked during his deposition if he believed that Chief Miller made decisions or took action based on Sells' gender, Sells answered "Not that I am aware of."  (Sells Dep. at 214.)  In addition, other than the fact that he received fewer and lower percentage wage increases than the women he supervised, Sells was unable to articulate facts to support his claim that decisions about his compensation were gender-based.  (*Id*. at 214-15, 225-27.)  Finally, Sells acknowledged in his deposition that there was a male dispatcher who received more raises than Sells.  (*Id*. at 258-59.)  This undermines his claim of gender discrimination.

Sells' grievance with the City appears to be based on alleged representations made to him when he was hired in the spring of 2000.  Even if promises were made to Sells, there is no evidence that any subsequent decisions about Sells' compensation were based on Sells' gender.  Sells' sole claim is one for gender discrimination (as opposed to a claim based on broken promises), and Sells has not pointed to any evidence that would support a finding of discriminatory motive or pretext.  Therefore, Sells' claim fails.

**ORDER**

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The City's Motion for Summary Judgment (Doc. No. [24]) is **GRANTED**; and

2. Sells' Amended Complaint (Doc. No. [10]) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated:  June 10, 2016                           s/Donovan W. Frank
                                                DONOVAN W. FRANK
                                                United States District Judge